IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCHES OF:<br><br>BLACK AND SILVER IPHONE, CELLULAR PHONE, S MODEL A1688, WITH A CRACKED SCREEN | Magistrate No. 19-1307 |
| BLACK AND SILVER IPHONE, CELLULAR PHONE, S MODEL A1688, WITH A CRACKED SCREEN (2ND IPHONE SEIZED) | Magistrate No. 19-1308 |
| SILVER SAMSUMNG GALAXY NOTE 9 SM-N96OU CELLULAR PHONE, WITH CRACKED SCREEN, IMEI: 359986090064798 | Magistrate No. 19-1309 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANTS**

I, Melissa Laukaitis, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.      I am a Special Agent with the United States Drug Enforcement Administration (DEA) having been employed as such for approximately the past thirteen (13) years. I am currently assigned to the DEA Pittsburgh District Office, Group 62. As part of my duties, I am authorized to conduct investigations of persons who engage in drug trafficking offenses; specifically, the unlawful distribution of controlled dangerous substances in violation of Title 21 United States

Code, Sections 841 and 846. I have obtained the information below through my direct involvement in this investigation and through other DEA Special Agents; Task Force Officers, State Officers, as well as reliable confidential sources.

    3.    Your Affiant has been involved in narcotics related arrests and the execution of search warrants which resulted in the seizure of narcotics, and assisted in the supervision of activities of informants who provided information and assistance resulting in drug buys. During the course of Your Affiant's training and experience, Your Affiant has become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, Your Affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, conducting and participating in short-term and long-term undercover operations including reverse undercover drug operations, consensual monitoring and recording of both telephonic and non-telephonic communications, analyzing pen register data, conducting court-authorized wire and oral interception electronic surveillance, and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity.

    4.    During my assignment with the DEA, I have participated in a wide variety of international and domestic investigations, including money laundering, drug trafficking, and airport interdiction. I have been the case agent for major narcotic investigations that led to the indictment of numerous individuals. I have been the affiant for, and participated in, numerous wiretap investigations during which I have monitored hundreds of hours of conversations between drug dealers.

5. I have received specialized training in multiple sessions and/or seminars on the sale and packaging of controlled substances, as well as firearms recognition and the characteristics of an armed gunman. I have utilized this training and experience and have participated in numerous significant arrests for illegal drug trafficking and/or the criminal possession/use of firearms. As a result of these investigations, my training and experience, conversations with other agents, and interviews of drug users and traffickers, I am familiar with the methods and language used by traffickers to smuggle, store, and distribute drugs, collect and launder drug proceeds, and avoid getting caught by law enforcement officers.

6. As part of my duties, I am authorized to conduct investigations of persons who engage in drug trafficking offenses; specifically, the unlawful distribution of controlled dangerous substances in violation of Title 21, United States Code, Sections 841 and 846. I have obtained the information below through my direct involvement in this investigation and through other DEA Special Agents, Task Force Officers, and other local officers.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7. Your Affiant seeks a search warrant for the three electronic storage devices described in Attachment A, the "TARGET DEVICES 1–3."

8. These devices have been in secure law enforcement custody since the time they were recovered (the circumstances of which are explained more fully below). Based on my training and experience, I know that the devices are in substantially the same state as they were when the devices first came into the possession of law enforcement.

## PROBABLE CAUSE

9. On April 26, 2019, Pennsylvania State Trooper Burkarth was conducting stationary patrol in a marked PA State Police vehicle on State Route 28 North by Exit 10, when he observed

a black Lincoln Continental traveling northbound on Route 28 with illegal window tint. Due to this traffic violation, Trooper Burkarth conducted a traffic stop on the vehicle, bearing PA registration KWJ-1499. Trooper Burkarth identified the driver as Kevin WATSON by his PA driver's license. While Trooper Burkarth was explaining the reason for the stop, he detected a strong odor of marijuana coming from inside the vehicle. Trooper Burkarth also observed a small child in the backseat, who later was identified as four-year-old Daniel Mott.

10. While Trooper Burkarth was speaking with WATSON, Trooper Burkarth observed signs of impairment, such as blood shot eyes, slow and sluggish demeanor, and WATSON appeared anxious. Due to these observations, Trooper Burkarth requested that WATSON exit the vehicle. WATSON refused and became aggressive, while demanding his attorney be called. Based on WATSON's actions, Trooper Burkarth requested assistance from another state trooper. Once Trooper Burkarth's back up arrived, WATSON continued to refuse to exit the vehicle and WATSON fled the traffic stop in his vehicle at a high speed.

11. The state police then pursued WATSON which ultimately ended in WATSON crashing his vehicle and fleeing on foot. The Pennsylvania State Police shortly thereafter took WATSON into police custody. TARGET DEVICE 1 on WATSON's person, along with bulk US Currency, suspected marijuana in a clear plastic baggie, and a glass jar containing marijuana. State Police then secured the black Lincoln Continental and towed it from the scene to the PA State Police Kittanning impound lot. Trooper Burkarth applied for and was granted a state search warrant for the Lincoln Continental, WATSON's vehicle.

12. During the search of the vehicle a State Police Canine was used, and the Canine displayed alert behavior to the front driver door and at the trunk of the vehicle. PA State Police located a plastic container of marijuana on the driver side floor and a jar in backseat with marijuana

4

residue. After gaining access to the trunk, PA State Police located numerous bricks of heroin marked with "BLUE MAGIC" in blue ink in white stamp bags contained in a brown box inside a plastic multi colored bag. The Pennsylvania State Police also located other items including, a plastic container containing suspected marijuana, a grinder, a digital scale, and TARGET DEVICES 2 and 3.

13. In addition, your affiant has examined WATSON's criminal record, and WATSON's record indicated an extensive criminal history to include arrests and convictions for: Possession of Firearms, multiple drug charges, multiple aggravated assaults, resisting arrest, and Firearms carried without a license. WATSON is also currently on Parole with the State of Pennsylvania.

14. The TARGET DEVICES are currently located in the evidence storage facility at the DEA Pittsburgh District Office at 1781 McKees Rocks Rd, McKees Rocks, PA 15136, and are stored in a manner that is designed to preserve the electronic data.

15. Your Affiant submits that there is probable cause to search the devices found in WATSON's vehicle (**TARGET DEVICES 1-3**).

**EVIDENCE COMMONLY GENERATED BY DRUG-TRAFFICKING AND ELECTRONIICALLY STORED IN CELLULAR TELEPHONES**

16. Your Affiant is aware through both training as well as experience gained through multiple narcotics investigations, the targets of those narcotics investigations utilize cellular telephones to not only arrange meetings with their drug customers but also speak with fellow co-conspirators as well as their drug sources of supply. Your Affiant is also aware that these targets also utilize multiple cellular telephones at one time in an effort to not only thwart detection by law

enforcement but also to compartmentalize their drug trafficking customers to one phone, their co-conspirators to another phone, and their drug source of supply to yet another phone.

17. Based upon my training and experience, I am aware that it is generally a common practice for drug traffickers to store the names and phone numbers of drug customers and photographs and video detailing illegal activities in cellular telephones. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

18. Members of Drug Trafficking Organizations (DTO) often take group photographs with other enterprise members posing with paraphernalia, money and/or drugs. Many cellular telephones have a camera feature that is readily capable of capturing and storing these group photos.

19. Members of DTOs often store each other's phone numbers and contact information in the directories of their cellular phones.

20. Based on my experience and familiarity with cellular telephones, I am aware that the telephones have voicemail and telephone directory features, as well as camera features which allow the user to take photographs and store them in the cellular phone's memory card. Based on my experience and training, statements by other law enforcement officers, and personal

6

observations, I know that because of the storage capacity of cellular telephones, the portability of cellular telephones, the ease with which information stored on a cellular telephone may be accessed and/or organized, and the need for frequent communication in arranging narcotics transactions, cellular telephones are frequently used by individuals involved in drug trafficking. In particular, I and other law enforcement officers have found that information frequently maintained on cellular telephones includes the contact numbers of other co-conspirators, contact numbers for narcotics customers and stored photographs of DTO activities. This evidence will come in the form of caller identification information, call log information, telephone numbers, address information, or other identification information, as well as opened and unopened voicemail and/or text messages, photographs, videos and information about access to the Internet.

21. Members of DTOs routinely use multiple physical phones in succession as one breaks or the DTO feels that the number associated with the phone is compromised to Law Enforcement. The physical phone may no longer be an active communicative device, however many times, these old phones are not discarded as they possess value to the DTO. The replaced device contains within it the contact information for drug customers of the DTO, and many times these phones are maintained as digital phone books should the new active phone become unusable or unavailable. Furthermore, these replaced phones are commonly kept in a relatively accessible location where either all or select members of the DTO can access the information within should it become necessary. As stated above, members of DTOs routinely take photographs and or memorialize other information of evidentiary value within these replaced phones. As such, it is common to recover a multitude of otherwise inactive phones especially at locations central to or important to the DTO.

## TECHNICAL TERMS

22. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communications through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

23. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four

satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

24. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

26. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

9

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

28. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29. I submit that this affidavit supports probable cause to believe that there has been a violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).

30. Based upon the foregoing, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **TARGET DEVICES 1-3**, as described more fully in Attachment A, to seek the items described in Attachment B.

*/s/ Melissa Laukaitis*
MELISSA LAUKAITIS
Special Agent
Drug Enforcement Administration

Subscribed to and Sworn before me
This 10th day of June, 2019.

*/s/ Cynthia R. Eddy*
CYNTHIA REED EDDY
Chief United States Magistrate Judge

11